DETROIT POLICE OFFICERS ASSOCI-ATION, William Morgan, Brian Burnett, and Donald Prince, Individually and as Representatives of a Class, Plaintiffs,

v.

Coleman A. YOUNG, Philip G. Tannian, Douglas Fraser, Susan Cooper, Charles Butler, Edward Littlejohn, Alexander Ritchie, and The City of Detroit, Defendants.

Nos. 74–CV–71838–DT, 75–CV–71376–DT.

United States District Court,
E.D. Michigan, S.D.

March 31, 1994.

Daniel B. Edelman, Washington, DC, Dennis Burnett, Elliot Hall, City of Detroit Law Dept., Detroit, MI, for defendants.

Allan D. Sobel, Rubenstein Plotkin, P.C., Southfield, MI, Walter ·S. Nussbaum, Southfield, MI, for plaintiffs.

***ORDER ACCEPTING MAGISTRATE JUDGE PEPE'S FEBRUARY 2, 1994 REPORT AND RECOMMENDATION***

GADOLA, District Judge.

The court, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 636(b)(1)(B), and LR 72.1(d)(2) (E.D.Mich. Jan. 1, 1992), has reviewed the magistrate judge's February 2, 1994 report and recommendation as well as plaintiffs' February 17, 1994 objections, defendants' March 2, 1994 response, and plaintiffs' March 18, 1994 reply filed thereto. After conducting a *de novo* review, the court accepts the magistrate judge's report and recommendation as the court's findings and conclusions.

The instant matter came before the court following the Sixth Circuit's determination that the City of Detroit's affirmative action plan regarding promotions to sergeant within the police department is ·at an end. *Detroit Police Officers Ass'n v. Young,* 989 F.2d 225 (6th Cir.1993). The Sixth Circuit remanded the case to this court for a determination of relief, if any, to which plaintiffs' may be entitled. The court finds that neither plaintiffs' nor their counsel are entitled to any relief. In addition, defendants' request for relief is outside the scope of this lawsuit and of the Sixth Circuit's remand order.

NOW, THEREFORE, IT IS HEREBY ORDERED that the magistrate judge's February 2, 1994 report and recommendation is **ADOPTED.**

IT IS FURTHER ORDERED that plaintiffs' motion for relief is **DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motion for attorney fees is **DENIED.**

IT IS FURTHER ORDERED that defendants' request for relief is **DENIED.**

**SO ORDERED.**

### *JUDGMENT*

This action came before the Court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly considered and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED that plaintiffs take nothing from defendants. Pursuant to the Sixth Circuit's remand order issued in this case, the court finds that neither plaintiffs nor their counsel are entitled to any relief. Therefore, plaintiffs' action is dismissed on the merits.

### REPORT AND RECOMMENDATION

PEPE, United States Magistrate Judge.

Plaintiffs are an association of White police officers in the Detroit Police Department, individual White officers, and the representatives of a class of White officers. They brought suit under 42 U.S.C. §§ 1981, 1983, and 1985, the Civil Rights Act of 1964, and various provisions of the Michigan Constitution claiming that an affirmative action program instituted by the Detroit Police Department violates their Fourteenth Amendment, statutory, and State constitutional rights. The Sixth Circuit ruled last year that the program had continued past the time· in which the goal for minority representation at the rank of police sergeant had been met, and that plaintiff class had thus suffered substantial hardship. *Detroit Police Officers Ass'n v. Young,* 989 F.2d 225 (6th Cir.1993). They remanded this case for a determination of the relief, if any, to which plaintiffs are entitled. This matter was referred to me for

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

BACKGROUND

On July 31, 1974, the Detroit Police Department adopted an affirmative action plan seeking to achieve an approximately 50/50 ratio in White and African–American sergeants. The plan called for promotions on a 50/50 basis, and created separate promotion lists for White and African–American candidates.

Defense counsel informed a panel of the Sixth Circuit on August 12, 1992, that the goal had virtually been reached. *See Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 227 n. 1 and accompanying text. Plaintiffs contend that, in the approximately 19 years during which the plan was in effect, 291 White officers were passed over for promotion for sergeant.

The litigation history of this case is complicated, and need not be discussed here except for the most recent round. On June 10, 1991, this Court entered an order granting defendants' motion for summary judgment, finding that the plan was still temporary in nature because the number of African–American sergeants did not yet equal the number of White sergeants.[1] Plaintiffs appealed. The Sixth Circuit found that the plan had lasted longer than necessary, and thus was not sufficiently narrowly tailored to meet Fourteenth Amendment concerns. "The plan, as well as the decree incorporating it, is no longer narrowly tailored. It no longer serves the same compelling state interests as it once did under the changed circumstances of almost two decades." *Detroit Police Officers Ass'n*, 989 F.2d at 228.

ANALYSIS

A. *Entitlement to Relief*

1. *Duration of Unconstitutionality*

■ Plaintiffs argue that governmental action which is unconstitutional in *void ab initio*. Therefore, plaintiffs argue, all 291 officers who were passed over for promotion during the life of the affirmative action plan are entitled to relief. Plaintiffs argument is flawed in one glaringly obvious respect: The Sixth Circuit did not hold that the affirmative action plan was unconstitutional from its inception. Rather, the Sixth Circuit held that the plan became unconstitutional when it continued after the goal of 50/50 representation was substantially achieved.[2]

Not all race conscious remedies are unconstitutional. They are subjected to strict scrutiny, *see City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989), meaning that race conscious remedies that are necessary to the accomplishment of a compelling state interest do pass constitutional muster. *Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984). To be "necessary" to the attainment of a compelling state interest, any race conscious remedy must be "narrowly tailored to the achievement of that goal." *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2776, 65 L.Ed.2d 902 (1980).

The Sixth Circuit explicitly pointed out that "[w]e have previously approved the implementation of the plan some five years ago...." 989 F.2d at 227. A plan is a constitutional remedy for past discrimination as long as it is narrowly tailored to the accomplishment of the state's compelling interest. Of the seven factors to be considered in determining whether a remedial plan is narrowly tailored, the Sixth Circuit stressed the importance of monitoring its duration. A plan ceases to be narrowly tailored when it continues past the date on which the State's compelling interest is achieved. "Limiting the duration of a race-conscious remedy which clearly impacts adversely upon the plaintiffs is a keystone of a narrowly tailored plan...." *Detroit Police Officers Ass'n*, 989 F.2d at 228. Clearly, then, the plan was not

---

1. According to the Sixth Circuit, in August 1993 the department had 312 White, 309 African–American, 4 Latino, and 2 Asian sergeants. *Detroit Police Officers Ass'n*, 989 F.2d at 227 n. 1.

2. Even though the raw numbers were not precisely equal at the time the Sixth Circuit issued its opinion (of 627 sergeants, there were three more White sergeants than African–American sergeants), Chief Judge Merritt concluded that the difference was "of no legal significance." *Detroit Police Officers Ass'n*, 989 F.2d at 228 (Merritt, C.J., concurring).

unconstitutional at its inception and not all 291 officers who have been passed over for promotion during that time are entitled to relief.

Plaintiffs also argue that, even if the plan was not unconstitutional from its inception, it became unconstitutional as of October 31, 1987 when, according to plaintiffs' expert, African–American representation at the rank of sergeant reached the level it would have reached had there been no past discrimination. Not surprisingly, defendants' expert disagrees with plaintiffs' expert's analysis.

It is unnecessary for this Court to determine whether plaintiffs' expert's figures are accurate. This Court specifically found that the 50% goal was constitutionally permissible. *Detroit Police Officers Association v. Young*, 765 F.Supp. 393, 396–98 (E.D.Mich. 1991). While the Sixth Circuit reversed this Court's entry of summary judgment, 989 F.2d at 228, that court did so on the grounds that the 50% goal had been substantially achieved and that it would be unconstitutional to *continue* to impose hardship on the plaintiff class, *i.e.* that the plan was *no longer* narrowly tailored to the accomplishment of a compelling state interest. Judge Gadola's detailed analysis of the 50% goal was not overruled by the Sixth Circuit.

By declining to disturb this Court's finding on the 50% goal and by basing its decision on the substantial attainment of this very goal, the Sixth Circuit has acquiesced in this Court's ruling that the goal of approximately 50% African–American representation at the rank of sergeant was constitutionally acceptable. The question to be determined, then, is when the plan became unconstitutional, *i.e.* when did it reach its goal, thus ceasing to be narrowly tailored to the accomplishment of a compelling governmental interest?

Statistics submitted as part of a stipulation show that, as of October 31, 1987, the date upon which plaintiffs claim the plan ceased to be narrowly tailored, African–Americans made up approximately 35.9% of the universe of White and African–American sergeants in the Detroit Police Department. It was not until June 30, 1992, that the disparity between White and African–American sergeants fell below one percent. The monthly manpower report dated June 30, 1992 indicates that 310 of 623 White and African–American sergeants,[3] or approximately 49.8% of the universe of White and African–American sergeants, were African–American. Just a month earlier, 313 of 645, or approximately 48.5%, of White and African–American sergeants were African–American. Thus, it was not until some time in 1992 that the disparity became legally insignificant. Therefore, the earliest date at which the plan can be said to have outlived its purpose was some time in 1992. For reasons noted below, this Court need not be more precise as to when the plan's goals were substantially achieved. Until some time in 1992, the plan was tailored with sufficient narrowness not to violate the Constitution.

Defendants state that the last promotion under the plan occurred in May 1989. They explain that the consistent increase in the percentage of African–American sergeants between that date and the present is due to attrition among more senior White sergeants. Plaintiffs do not dispute that May 1989 was the last date on which anyone was promoted to sergeant. Because the plan did not cease to be "narrowly tailored" until 1992, three years after the date of the last promotions to the rank of sergeant, no identified individual was injured by the continued application of the plan until March 24, 1993 when the Sixth Circuit ended the plan.

### 2. Multiple Pass–Overs

■ Finally, plaintiffs argue that those officers who were passed over for promotion more than once are entitled to relief. As discussed above, no individual was injured by an unconstitutional application of the plan. Each and every time promotions were made under the plan, the plan was "narrowly tailored" and thus constitutional. But plaintiffs point to the Sixth Circuit's observation that "the nineteen year term of this plan has been

---

**3.** The report also indicates that there were four Latino, two Native American and two Asian sergeants as of that date.

excessive and has worked substantial hardship upon plaintiffs...." *Detroit Police Officers Ass'n,* 989 F.2d at 228. It is true that innocent plaintiffs have paid the price of delays and denials of promotions to help redress past wrongs that they did not commit. This moral dilemma is one that a city might attempt to lessen by reallocating the costs of an affirmative action plan more broadly by compensating or otherwise aiding those qualified individuals who were passed over twice for promotion. Yet, however just and meritorious the claims of this subset of the plaintiffs may be, compensatory action by a city, like many good ideas of governance, is not constitutionally required. Thus, the claims of those who have twice been denied promotion should be addressed to the political branches of government and not to the courts.

As the Sixth Circuit stated earlier in this protracted litigation:

> concern for the interests of white employees cannot be allowed to thwart achievement of the state's goals. It is reasonable for some persons innocent of wrongdoing to bear some burden in order to correct the harsh effects of a grievous wrong of constitutional dimensions and enhance the public safety by improved law enforcement.

*Detroit Police Officers Ass'n v. Young,* 608 F.2d 671, 696 (6th Cir.1979).

Plaintiffs argue that those officers who have been passed over more than once have borne more than "some burden." They argue that "[t]he denial of promotion is similar to the losses experienced by the teachers in *Wygant [v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)]...." Joint Brief of Plaintiffs' Entitlement to Relief at 9. But there are two key distinctions between plaintiffs in this case and the plaintiffs in *Wygant.*

First, the plan struck down in *Wygant* was held to have been implemented for an unconstitutional reason: to remedy past *societal* discrimination, not past discrimination by the defendant school board. 476 U.S. at 274–76, 106 S.Ct. at 1847–48. Thus, the plan in *Wygant* was unconstitutional from its inception. In this case, long-standing discrimina-

tory hiring and promotion practices by the Detroit Police Department have been established. *Detroit Police Officers Association v. Young,* 824 F.2d 512, 515–17 (6th Cir.1987).

Second, the *Wygant* plaintiffs suffered layoffs, *i.e.* loss of their jobs. Plaintiffs in this case have merely been denied promotions. The Sixth Circuit recognized the importance of this distinction when it stated:

> [t]his is not a case in which white employees are deprived of vested employment rights. At most, the white patrolmen had an expectation of promotion under certain conditions. These conditions were altered by the BPC under authority of the City Charter. *See Franks v. Bowman Transp. Co.,* 424 U.S. 747, 778, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444 (1976).

608 F.2d at 696 n. 12.

The fact that some White patrolmen had their expectation of promotion frustrated more than once by the operation of a constitutionally valid affirmative action plan is a real and unfortunate harm. But this harm alone does not render the plan unconstitutional. No member of the plaintiff class is entitled to any relief from the courts. Their petitions for redress of any unfairness and harm should be addressed to the other branches of government.

### B. *Attorney Fees and Costs*

■ Plaintiffs move for attorney fees and costs under 42 U.S.C. §§ 1988 and 2000e–5. Section 1988 states, in relevant part:

> In any action or proceeding to enforce a provision of Sections 1977, 1978, 1979, 1980 and 1981 of the Revised Statutes [42 U.S.C. §§ 1981–1983, 1985, 1986] ... or Title VI of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000d *et seq.*], the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of costs.

Section 2000e–5 contains a substantially similar provision relating to suits brought under Title VII. The threshold question is whether plaintiffs are a "prevailing party."

Plaintiffs contend that they have prevailed on the merits because the Sixth Circuit last

year held that the continued implementation of the plan would be unconstitutional. The Sixth Circuit held that the continued operation of the plan would be unconstitutional because the plan had substantially achieved its goals. "Under the circumstances of this case, we rule that the goal sought of 50% black (and minority) sergeants has been virtually attained." 989 F.2d at 228. In other words, the Sixth Circuit held that the plan terminated by its own terms. The plan was not held to be unconstitutional at any point prior to the attainment of its stated goal. It was held that the *continued operation* of the plan would be unconstitutional because the goal had been achieved, and to continue the plan would unnecessarily and adversely impact on plaintiffs' rights. But in nearly 20 years of litigation, plaintiffs have not obtained a judgment that has withstood appellate review that the plan was unconstitutional or violated plaintiffs' statutory rights. The only judicial mandate favorable to plaintiffs on the merits of this case that still stands as good law is the Sixth Circuit's opinion last year that the constitutionality of the plan expired, after 19 years of operation. Yet, this was triggered by defense counsel's acknowledgement at oral argument "that the present ratio of black sergeants is virtually fifty percent." 989 F.2d at 226–27. The Sixth Circuit's determination was a reiteration of the reality acknowledged by defendants that, on recent review of the objective statistics, the plan's goal had been substantially attained. Therefore, this litigation did not result in the termination of the plan; the plan, in effect, ended by its own terms.

This appears to be precisely the sort of "technical victory [which is] so insignificant . . . as to be insufficient to support prevailing party status" described by the Supreme Court in *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). The Court used as an example the

finding *sub judice* that a school district rule barring nonschool hour meetings by the plaintiffs without prior approval from the defendant was unconstitutionally vague. The Court deemed this a merely technical victory because the permission was never withheld. The Court stated that "[i]f this had been petitioners' only success in this litigation, we think it clear that this alone would not have rendered them 'prevailing parties' within the meaning of § 1988." *Id.*

In this case, plaintiffs obtained a ruling from the Sixth Circuit that an affirmative action plan that had operated constitutionally for nearly two decades was no longer to be applied because it had substantially achieved its goal. While it is true that defendants can no longer use the same promotion criteria used under the plan, this was the result of recent objective measurement of racial ratios under the plan, and not a product of the complaints or other pleadings filed by plaintiffs since 1974. The plan ended when it substantially met its own terms. At that point, after this fact was, in effect, acknowledged by defense counsel at oral argument, the Sixth Circuit declared it terminated. Plaintiffs' claims for almost 20 years that the plan was unconstitutional have repeatedly been rejected. The plan itself was constitutional while it affected substantial change in the surrounding circumstances to achieve its goals.

Plaintiffs have not demonstrated that their law suit ended the plan. Thus, this litigation has not "change[d] the legal relationship between [plaintiffs] and the defendant[s]." *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. at 792, 109 S.Ct. at 1493. That legal relationship changed by the terms of the affirmative action plan. Plaintiffs have not demonstrated that this change would not have occurred when the plan met its goal if they had not initiated this litigation.[4]

---

4. Yet, even if this was more than a mere "technical victory," plaintiffs would not be entitled to any attorney fees. In *Farrar v. Hobby*, —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Supreme Court quoted the findings of the United States Court of Appeals for the Fifth Circuit that "The Farrars sued for $17 million in money damages; the jury gave them nothing. No money damages. No declaratory relief. No injunctive relief. Nothing. . . . [T]he Farrars did succeed in securing a jury-finding that Hobby violated their civil rights and a nominal award of one dollar. However, this finding did not in any meaningful sense 'change the legal relationship' between the Farrars and Hobby. Nor was the result a success for the

# 578

## C. Defendants' Request for Relief

 Defendants also request the Court's assistance in formulating a new nondiscriminatory promotion procedure. They complain that plaintiff Detroit Police Officers Association has in the past attempted to hinder the implementation of such a plan, and fear that it will continue to do so in the future.

The Court should decline to address defendants' request. First, the Sixth Circuit's remand order states that this Court is to determine the relief, if any, plaintiffs or their counsel are entitled to. Therefore, defendants' request is outside the scope of the remand order.

Second, defendants' request appears to be outside the scope of this lawsuit. Defendants do not appear to have ever filed a counter-complaint raising this issue, and there apparently has been no record established regarding defendants' proposed promotion plan, or regarding plaintiff's alleged past conduct.

Third, defendants' request appears to be premature. They state that plaintiff has acted in the past to hinder implementation of a nondiscriminatory plan, and fear that plaintiff will continue to so act. When and if plaintiff acts illegally to impair a valid nondiscriminatory promotion plan, defendants may seek the appropriate legal recourse. But mere hypothetical concerns that such illegal action will occur in the future do not state a controversy ripe for adjudication.

## RECOMMENDATION

For the reasons stated above, it is recommended that plaintiffs' motion for relief be denied. It is further recommended that plaintiffs' motion for attorney's fees and costs be denied, and that defendants' request for relief be denied.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); E.D.Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson*, 832 F.2d 950, 957–58 (6th Cir.1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: Feb. 2, 1994.

---

Farrars on a 'significant issue that achieve[d] some of the benefit the [Farrars] sought in bringing suit.' When the sole relief sought is money damages, we fail to see how a party "prevails" by winning one dollar out of the $17 million requested."
*Farrar v. Hobby*, —— U.S. at ——, 113 S.Ct. at 571 (quoting *Estate of Farrar v. Cain*, 941 F.2d 1311, 1315 (5th Cir.1991)) (citations omitted). The Supreme Court stated that
> to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.... In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar*, —— U.S. at ——, 113 S.Ct. at 573. The Court disagreed with the Fifth Circuit that the *Farrar* plaintiffs were not prevailing parties. But the Court held that "[a]lthough the 'technical' nature of a nominal damages award does not affect the prevailing party inquiry, it does bear on the propriety of fees under § 1988." *Id.* at ——, 113 S.Ct. at 574. The Court pointed out that
> [i]n a civil rights suit for damages ... the awarding of nominal damages ... highlights the plaintiff's failure to demonstrate actual, compensable injury ... When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief ... the only reasonable fee is usually no fee at all.

*Id.* at ——, 113 S.Ct. at 575.
Even if plaintiffs' dubious claim of victory on the merits is accepted, all they obtained was a ruling that the plan had become unconstitutional after 19 years of valid operation. As discussed in the text above, plaintiffs have failed to demonstrate any compensable injury because all hiring decisions affecting members of the plaintiff class were made during the period of time in which the plan operated within constitutional parameters. They are thus not entitled to attorney's fees under *Farrar v. Hobby*.